# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## DOCKET NO.: 24-11069-GG

DAVITA KEY,

Plaintiff – Appellee,

v.

DYNAMIC SECURITY, INC.,

Defendant – Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
DISTRICT COURT CIVIL ACTION NO.: 2:19-cv-0767-ECM

## APPELLEE BRIEF

COUNSEL FOR APPELLANT:

Heather Newsom Leonard
HEATHER LEONARD, P.C.
2105 Devereaux Cir, Ste 111
Birmingham, AL 35234
Phone: (205) 977-5421
Heather@HeatherLeonardPC.com

Leslie A. Palmer
PALMER LAW, LLC
104 23rd St. S., Ste 100
Birmingham, AL 35233
Phone: (205) 285-3050
Leslie@PalmerLegalServices.com

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 26.1-1, the undersigned counsel of record for the Appellant hereby certifies the following is a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations (including subsidiaries, conglomerates, affiliates, parent corporations and any publicly held corporation which owns 10% or more of the party's stock), and other identifiable legal entities related to a party that has an interest in this case.

1. Bond, Cortlin, Counsel for HEA, Appellee Companion Case – (no appearance on appeal)

2. Bradley Arant Boult Cummings LLP Counsel for HEA, Appellee Companion Case

3. Brown, Whitney Ryan, Counsel for HMMA, Appellee Companion Case

4. Bullock, Susan W., Counsel for Dynamic, Appellant

5. Burney, Schyler B., Counsel for HEA, Appellee Companion Case

6. Doyle, Hon. Stephen M., US Magistrate Judge

7. Dynamic Security, Inc., Defendant, Appellant

8. Equal Employment Opportunity Commission, Amicus Curiae (companion case)

9. FordHarrison, LLP, Counsel for Dynamic, Appellant

10. Gilbride, Karla, General Counsel, EEOC (companion case)

11. Goldstein, Jennifer S., Associate General Counsel, EEOC (companion case)

12. Heather Leonard P.C., Counsel for Plaintiff Appellee

13. Hyundai ENG America, Inc. ("HEA"), Defendant, Appellee in Companion Case

14. Hyundai Motor Manufacturing of Alabama, LLC ("HMMA"), Defendant, Appellee in Companion Case

15. Key, Davita M., Plaintiff/Appellee

16. Lehr Middlebrooks Vreeland & Thompson, P.C., Counsel for HMMA, Appellee Companion Case

17. Leonard, Heather Newsom, Counsel for Plaintiff, Appellee

18. Marks, Hon. Emily C., US District Court Judge

19. Middlebrooks, David, Counsel for HMMA, Appellee Companion Case

20. Miller, Matthew T, Counsel for HEA, Appellee Companion Case

21. Occhialino, Anne Noel, Associate General Counsel, EEOC (companion case)

22. Palmer Law, LLC, Counsel for Plaintiff Appellee

23. Palmer, Leslie A., Counsel for Plaintiff Appellee

24. Redmond, Wesley C., Counsel for Dynamic, Appellant

25. Smith, Scott Burnett, Counsel for HEA, Appellee Companion Case

26. Vaughn, Sarahanne, Counsel for HEA, Appellee Companion Case

27. Yeomans, Georgina C., Attorney, EEOC (companion case)

Respectfully submitted this 27th day of January, 2025.

/s/ Leslie A. Palmer
Leslie A. Palmer
*Attorney for Appellee*

OF COUNSEL:
PALMER LAW, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
(205)285-3050
leslie@palmerlegalservice.com

## STATEMENT REGARDING ORAL ARGUMENT

Appellee believes oral argument would assist the Court in resolving the issues raised on appeal.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................................................. II

STATEMENT REGARDING ORAL ARGUMENT .................................................... V

TABLE OF CONTENTS ............................................................................................ VI

TABLE OF AUTHORITIES ..................................................................................... VIII

STATEMENT OF JURISDICTION ............................................................................. 1

    Subject Matter Jurisdiction ...................................................................................... 1
    Appellate Jurisdiction .............................................................................................. 1

STATEMENT OF THE ISSUES .................................................................................. 2

STATEMENT OF THE CASE ...................................................................................... 3

Course of Proceedings and Disposition Below ........................................................... 3

Statement of the Facts .................................................................................................. 4

SUMMARY OF THE ARGUMENT .......................................................................... 14

ARGUMENT .............................................................................................................. 15

    I.    The trial court properly denied Dynamic's motion to strike a jury trial. ..................... 15

    II.    Key engaged in protected activity by complaining of race discrimination. ................. 19

    III.  The trial court correctly admitted evidence of statements that spoke to the effect on Key. 26

    IV.  Dynamic never reassigned Key because of her protected activity. ............................. 29

    V.    The trial court correctly charged the jury on retaliation. ............................................ 30

        A.    This Court's instructions on retaliation accurately presented the law. .................... 32
        B.    The trial court accurately instructed the jury on causation. ..................................... 34

    VI.  Closing arguments were not improper. ....................................................................... 37

    VII. The trial court did not abuse its discretion by upholding the jury award on punitive and compensatory damages ................................................................................................. 40

        A.    The jury's award of compensatory damages was supported by the evidence. ......... 40

B.    The jury heard sufficient evidence to find Dynamic acted with malice or reckless inference to Key's federally protected rights to support a punitive damages award. ........ 43

C.    The jury's award of punitive damages was not excessive. ........................................ 44

CONCLUSION ................................................................................................................. 45

CERTIFICATE OF COMPLAINCE ............................................................................. 46

CERTIFICATE OF SERVICE ....................................................................................... 47

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aetna Ins. Co., v. Kennedy*, 301 U.S. 389, 393 (1937) ...........................................17

*Akouri v. Fla. DOT*, 408 F.3d 1338 (11th Cir. 2005)...............................................42

*Alkins v. Sheriff of Gwinnett Cty.*, 2022 U.S. App. LEXIS 23352, at *5-6, (11th Cir.

    Aug. 22, 2022) ....................................................................................................20

*Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir.1988) ...............................37

*Allstate Ins. Co. v.* Swann, 27 F.3d 1539, 1543 (11th Cir. 1994) ...........................27

*BankAtlantic v. Blythe Eastman Paine Webber, Inc.,* 955 F.2d 1467, 1474 (11th

    Cir. 1992) ..........................................................................................................37

*Borgh v. Gentry*, 953 F.2d 1309, 1311 (11th Cir. 1992).........................................17

*Bostock v. Clayton Cty*., 140 S. Ct. 1731, 1745 (2020............................................34

Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C.Cir.2006) ...............................33

*Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) .................45

*Burns v. Lawther*, 53 F.3d 1237, 1240 (11th Cir. 1995) .........................................16

*Chavers v. Sec'y, Fla. Dep't of Corr*., 468 F.3d 1273, 1275 (11th Cir. 2006) ........21

*Conroy v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1233 (11th Cir. 2004)

    ..........................................................................................................................31

*Deakle v. John E. Graham & Sons*, 756 F.2d 821, 827 (11th Cir. 1985) ...............40

*Drago v. Jenne*, 453 F.3d 1301, 1305 (11th Cir. 2006) ..........................................43

*Equal Emp't Opportunity Comm'n v. Catastrophe Management*, 852 F.3d 1018

(11th Cir. 2016)........................................................................................21

*Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999).........................41

*Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) ...20, 22, 25, 26

*Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1287 (11th Cir. 2008)........36, 37

*Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1448 (1985) ...................40

*Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977)...................................................41

*Gowski v. Peake*, 682 F.3d 1299, 1310 (11th Cir. 2012) .........................................31

*Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998). ........25

*Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) .................................18

*Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) ..............................................................................................................26

*Marable v. Walker*, 704 F.2d 1219, 1220-21 (11th Cir. 1983) ...............................41

*Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 n.3 (11th Cir. 2020) ..25

*Mazloum v. District of Columbia,* 442 F. Supp. 2d 1, 13 (Dist. of Columbia 2006) .......................................................................................................................33

*McGregor v. Board of Commissioners of Palm Beach County*, 956 F.2d 1017, 1022 (11th Cir. 1992).........................................................................................18

*Okoli v. City Of Baltimore* , 648 F.3d 216, 224, n.8 (4th Cir. 2011).......................33

Olson v. Lowe's Home Ctrs. Inc., 130 Fed.Appx. 380, 391 n. 22 (11th Cir.2005)30, 33

*Peterson v. Willie*, 81 F.3d 1033, 1036 (11th Cir. 1996) ........................................37

*See Danow v. Borack*, 346 F. App'x 409, 410 (11th Cir.2009)..............................37

*Tracinda Corp. v. DaimlerChrysler AG,* 502 F.3d 212, 222 (3rd Cir. 2007) .........17

*United States v. Howard,* 953 F.2d 610, 612 & n. 1 (11th Cir.1992) ...............27, 28

*United States v. Tombrello,* 666 F.2d 485, 491 (11th Cir.)....................................27

*United States v. Verbitskaya*, 406 F.3d 1324, 1330-1331 (11th Cir. 2005) ............31

*Vineyard v. County of Murray, Ga.*, 990 F.2d 1207, 1214 (11th Cir.1993)............37

**Statutes**
28 U.S.C. § 1291 ...................................................................................................1

28 U.S.C. §§1331 ..................................................................................................1

42 U.S.C. § 1331 ...................................................................................................1

42 U.S.C. § 1367 ...................................................................................................1

**Rules**
Fed. R. App. P. 32 ..............................................................................................46

Fed. R. Civ. P. 39 ...............................................................................................19

Fed. R. Evid. 801................................................................................................27

## STATEMENT OF JURISDICTION

### Subject Matter Jurisdiction

This Court has federal question subject matter jurisdiction. Davita Key ("Key") sued Dynamic alleging retaliation under 42 U.S.C. § 1981 (Doc.28). Subject matter jurisdiction was based on 28 U.S.C. §§1331, 1343, and 42 U.S.C. §2000e-5(f)(3). (Doc.28).

### Appellate Jurisdiction

The district court entered a final order in this case on March 11, 2024 (Doc. 212). On February 10, 2023, the court granted partial summary judgment on Key's claims against Dynamic Security. (Doc.138). After a jury trial on Key's only remaining count against Dynamic Security, the court entered an order disposing of the last post judgment motion on March 11, 2024. (Doc.212). Defendant-Appellant Dynamic Security filed its Notice of Appeal on April 5, 2024. (Doc.217) Appellate jurisdiction exists under 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

1.  Whether the District Court properly denied Dynamic's motion to strike Key's jury demand where the evidence showed no knowing and voluntary waiver.

2. Whether Key presented evidence of protected activity and causation.

3. Whether the District Court's admission of non-hearsay comments violated the best evidence rule when the comment was offered only to show its effect on Key.

4. Whether the District Court properly instructed the jury as to the requirements of Key's retaliation claim where the jury instruction explained the elements and causation standard.

5. Whether the District Court properly denied Dynamics post-trial motions seeking a new trial and to remit punitive and compensatory damages award where the evidence supported the jury's verdict.

## STATEMENT OF THE CASE

### Course of Proceedings and Disposition Below

Appellee, Davita Key ("Key") supplements Appellant's *Statement of the Course of Proceedings and Disposition Below* with the following:

Key sued Hyundai Motor Manufacturing of Alabama, LLC ("HMMA"), Hyundai ENG America, Inc. ("HEA") (collectively "Hyundai"), and Dynamic Security, Inc. ("Dynamic"), alleging that each, as an employer, violated her rights under Title VII and 42 U.S.C. § 1981. (Doc.28). All Defendants-Appellees moved to dismiss the claims. (Doc.30 HMMA) (Doc.31 HEA) (Doc.32 Dynamic). Key opposed the motions. (Doc.34). After briefing, the District Court denied the motions as to Dynamic and HMMA, but granted the motion, in part, to HEA, as to all Title VII claims against it. (Doc.38 p1-2, 9). After the close of discovery, Appellees-Defendants moved for summary judgment on all remaining counts. (Doc.66-67 HMMA) (Doc.69-70 HEA) (Doc.73-74 Dynamic). Key opposed the motions (Doc.82). On December 27, 2022, Dynamic filed a Motion to strike Key's jury demand. (Doc. 89). On February 10, 2023, the District Court granted summary judgment on all remaining counts against HEA and HMMA, and on all but the §1981 retaliation claim against Dynamic (Doc.138 p43). After hearing, the court denied Dynamic's Motion to Strike the jury demand. (Doc. 147). Before and during the trial, the trial court made various evidentiary rulings which Dynamic

appeals. At the close of Key's case, Dynamic moved for Judgment as a matter of law, which the court denied. The Court also denied Dynamic's renewed motion at the close of evidence. A jury returned a verdict in Key's favor, from which Dynamic appeals. The court also denied Dynamic's post-trial motions. (Doc.212).

**<u>Statement of the Facts</u>**

Hyundai Motor Manufacturing, LLC ("HMMA") owns and operates an automotive assembly plant in Montgomery, Alabama. (Doc. 194, p. 6). Hyundai Engineering America, Incorporated ("HEA") provides a variety of services to HMMA, including security. (Doc. 194, p. 6). HEA employed Cassandra Williams as the manager of security services. (Doc. 194, p. 6). Dynamic Security, Incorporated ("Dynamic") provided people to HEA to work at the HMMA location, including the mailroom, during the events relevant to this action. (Doc. 194, pp. 6, 108-109).

Key is a black female. (Doc. 194, p. 7). Key wears her hair naturally, styled in locks. (Doc. 194, pp. 43-44). She has worn her hair naturally in locks since she was eighteen. (Doc. 194, p. 44). She palm rolls her hair, and due to her hair's natural texture, it locks. (Doc. 194, pp. 101-102). Her hair would naturally lock if she did not twist it. (Id.).

In July 2017, Key finished working towards a master's degree and was pregnant. (Doc. 194, p. 48). Wanting to contribute to her household income, Key

began looking for a job. (Doc. 194, pp. 48-49). She saw on Indeed Dynamic's posting for a mailroom position at the Hyundai facility and applied. (Doc. 194, pp. 6, 49). On July 17, 2017, Key received an email for Gloria Robinson with Dynamic asking Key to report for a interview. (Doc. 194, p. 49).

Robinson interviewed Key on July 19, 2017, for the mailroom job at HMMA, a forty-hour a week job. (Doc. 194, p. 49). During the interview, Robinson told Key she would be a good fit, but commented, "Oh, but your hair might be an issue." (Doc. 194, p. 51). Robinson then asked Williams from HEA what Williams thought of Key's hair. (Doc. 194, p. 51). Williams asked Robinson in response "what was Dynamic's policy?" (Doc. 194, p. 51). Robinson did not know. (Doc. 194, p. 51). Key showed Williams and Robinson picture of her locks styled in an updo, and both women said "okay." (Doc. 194, p. 51).

Dynamic extended Key an offer of employment on July 21, 2017, for the HMMA mailroom assignment. (Doc. 194, p. 51). The offer, contained in an email, made no reference to Key's hair. (Doc. 194, p. 52).

On or about July 21, 2017, before starting at HMMA, Key went through training at Dynamic. (Doc. 194, pp. 53-54; Doc. 195, p. 22). Key does not recall any training during the orientation about harassment or discrimination. (Doc. 194, pp. 53-54). During the orientation, Dynamic had Key complete a job application.

(Doc. 194, p. 55). On the application, she identified she would be able to work any shift. (Doc. 194, p. 55).

During training, Dynamic also gave Key its employee handbook and had her sign an acknowledgment of its receipt. (Doc. 194, p. 105). It was presented to her "like a stack of handbooks, and then you signed and you take a handbook." (Doc. 195, pp. 22-23). Key skimmed read parts of the handbook, such as Dynamic's grooming policy. (Doc. 194, pp. 106-107, Doc. 195, p. 23). Key does not recall when she read the portion of the handbook relating to waiver of a jury trial and could not say she read it before her first day of work at Dynamic or if it was after she stopped working for Dynamic. (Doc. 194, pp. 107-108).

During the training, Key asked Dynamic's office manager, Nicole Scavella, if there was an issue with Key's hair. (Doc. 195, p. 34). Scavella looked in the handbook and responded that "there's nothing wrong with your hair." (Doc. 195, pp. 33-34). As a result, Key did not style her locks in an updo. (Id.).

On July 31, 2027, Key reported to work at HMMA. (Doc. 194, p. 56). Her hair appeared the same as it did when she interviewed and went through training, with her locks in a hair band. (Doc. 194, p. 112; Doc. 195, pp. 35-36). Key's hair was consistent with Dynamic's policy. (Doc. 194, p. 122). After Key had been working approximately an hour and fifteen minutes, Robinson sent Key home,

purportedly due to Key's hair being in locks. (Doc. 194, pp. 56-57, 113).[1] Key told her that her hair complied with Dynamic's policy. (Doc. 195, p. 39). Robinson told her "the Koreans there - - she said that they send these memos , and they don't want African Americans wearing their hair like this because she said, you know, you have people like Todd Strange, who he was the mayor at that time . . . [who they do not] want to see me and my hair like that. (Doc. 194, p. 57).[2] Key thought the statement was racist. (Doc. 194, pp. 57, 116).

Key returned to work on August 1, 2017, wearing a hat that covered her hair. (Doc. 194, p. 58). When Key began the day, her trainer questioned Key as to why she had left work early the day before. (Doc. 194, p. 58). Key responded that she had been sent home due to her hair, and she did not think that it was fair. (Doc. 194, p. 58).

Shortly thereafter, Maurice Chambliss of Dynamic called Key to a meeting with him and Robinson. (Doc. 194, p. 58). Robinson began the meeting by saying in an aggressive and hostile tone, "So I heard that you feel like you been discriminated against." (Doc. 194, pp. 59-60). Key responded that she was wearing a hat, as instructed. (Doc. 194, p. 60). Robinson replied, "This is going to be a

---

[1]    Robinson asked Key if she had a hat to wear. (Doc. 194, p. 114). Key said she did, but that she lived about twenty minutes away. (Id.) Robinson told her to go home for the day. (Id.).

[2]    Dynamic called Williams as a trial witness. She testified HMMA was a Korean owned company (Doc. 196, p. 20), and that she had drafted a policy for HEA prohibiting dreadlocks and braids from HMMA's policy. (Doc. 196, pp. 20-21).

problem. You're going to be a problem." (Doc. 194, p. 60). When Key again said she was wearing a hat covering her hair, as instructed, Robinson said, "This is not about your hat, like, this is not about your hat. This not about your hair." (Doc. 194, p. 60).

After the meeting, Chambliss took Key back to the mailroom. (Doc. 194, p. 63). Key asked her trainer, "Did you tell them I felt discriminated against?" (Doc. 194, p. 63). The trainer responded, "Yes, because that's what you said." (Doc. 194, p. 63). Key then told Chambliss she would like to speak with someone in Human Resources ("HR") so that she could make an official complaint of discrimination. (Doc. 194, pp. 63, 76). Chambliss told Key she would have to speak to Robinson. (Doc. 194, p. 63). When Key asked if there was anyone else with whom she could speak, Chambliss called Robinson and asked what to do. (Doc. 194, p. 63).

Key reduced her official complaint of discrimination to writing and gave the document to Chambliss. (Doc. 194, p. 64). Key complained she "was being discriminated against because of [her] hair in dreadlocks, and also because [she] was pregnant." (Doc. 194, p. 65). Key viewed her complaint as a complaint of race discrimination:

```
4   A.  I believed that -- because I had already spoken with
5   Ms. Robinson, and because she told me that Koreans at Hyundai
6   didn't want me to wear -- or didn't want African Americans to
7   wear their hair in dreadlocks, which in turn I feel like is
8   racist, so I contributed that my hair, which is in dreadlocks,
9   and I'm black, so they go together.  Hand in hand.
```

(Doc. 194, p. 66).

Even though Williams and Robinson were black, Key felt their actions concerning her hair were racist because Robinson had told her "that Koreans didn't want African Americans earing their hair in the dreadlock hairstyle" and she as complying with that directive. (Doc. 194, pp. 66-67).

Key asked Chambliss if she could leave to speak with Ray Cureton at Dynamic's office. (Doc. 194, p. 68). Key thought Cureton was HR, but he was Dynamic's district manager and acting operations manager with authority for Montgomery through the northern part of Alabama. (Doc. 194, p. 68; Doc. 195, pp. 44-45). Chambliss confirmed to Key that if she left to speak with Cureton, she would be able to return to work. (Doc. 194, p. 68). Key left with permission. (Doc. 194, p.121).

Chambliss emailed Cureton Key's discrimination complaint as well as a statement from Key's trainer that Key had complained of discrimination. (Doc. 195, p. 51; Plaintiff's Trial Exhibit 4). As soon as Key reached Dynamic's office, Cureton opened the door and asked Key, "Are you going to sue us?" (Doc. 194, p.

68; Doc. 195, p. 56). Key told him what transpired that morning and the day prior. (Doc. 194, p. 68). Cureton expressed disbelief at her complaint but said, "I'm just a big fat white guy. What do I know about you feeling discriminated against." (Doc. 194, pp. 68-69). Dynamic's anti-discrimination, which Cureton received, defined race discrimination as including discrimination based on hair texture. (Doc. 195, pp. 47-48). Cureton then told Key she could not return to work, saying "they don't want you back at the site." (Doc. 194, p. 69). Key asked why, and he said "[b]ecause of your hair and something else." (Doc. 194, pp.69, 89). He did not identify what the "something else" was. (Id.).

Key last worked for Dynamic at the HMMA assignment on August 1, 2017. (Doc. 194, p. 7). However, when she left Dynamic's office that day, she thought her work with Dynamic would continue. (Doc. 194, p. 70). Cureton had mentioned to Key there may be part-time positions on the horizon, but Key would not make as much in those positions. (Doc. 194, p. 70). Key affirmed her interest in continued employment by responding, "beggars can't be choosers." (Doc. 194, p. 70). Cureton said he would let her know. (Id). He never did. (Doc. 194, pp. 70-71). Despite Dynamic never contacting her, Key reached out to Dynamic the next two days and left messages for Cureton. (Doc. 194, pp. 71-72). He never responded. (Doc. 194, p. 70).

After Key left, Cureton emailed Sherry Spires in HR for Dynamic. (Doc. 195, pp. 51-55). The email informed Spires that Key wanted to file an official complaint of discrimination, noted he could attempt to reassign Key, but cautioned that he did not think doing so would be advisable if she were to pursue her complaint of discrimination:



(Doc. 195, pp. 51-55; Plaintiff's Trial Exhibit 4).[3]

Spires, in speaking with Cureton, advised him that she had dealt with situations like this before where the company had "issues in the past regarding hair

---

[3]   Spires conceded at trial, after being impeached with her deposition testimony, that Cureton's question about reassignment was retaliatory. (Doc. 195, pp. 123-126). However, she had no memory of telling Mr. Cureton it would be retaliatory not to reassign Key. (Doc. 195, pp. 127-128).

and other hair accessories from different races." (Doc. 195, pp. 121). Spires understood that complaints about the way someone could wear her hair could touch on the issue of race discrimination. (Doc. 1958, p. 122).

On August 3, 2017, the Key went to the United States Equal Employment Opportunity Commission ("EEOC") for an intake interview to complain of race discrimination, sex discrimination, and retaliation. (Doc. 194, pp. 72-73).

On August 7, Cureton emailed Spires that Key was requesting copies of her paperwork concerning her removal from Hyundai. (Doc. 195, pp. 63-65, Plaintiff's Trial Exhibit 5). Not having received an answer to his August 1 inquiry, he renewed his question about whether it was advisable to continue Key's employment in light of her complaints, writing:

> Ms. Key, who was recently removed from HMMA because of an issue with her hair, has technically not been terminated from Dynamic, and is asking for copies of the paperwork dealing with her removal from Hyundai. Should I allow her to review the information such as the written policy from HMMA, and/or the memo from Gloria concerning her situation? Is she entitled to have copies of any of this information since she has not been terminated? Also, is it advisable to try to move her to a different site when she is making threats to sue HMMA over the appearance standards?

(Id.)

On August 8, 2017, Key met with Cureton and submitted a rebuttal to a statement from Robinson. (Doc. 194, p. 72). Key wrote in her rebuttal that as "an employee who was to report any discrimination to Ms. Robinson, I felt threatened and intimidated." (Doc. 194, p. 76). During that time, she again asked about open positions. (Doc. 194, p. 72). She was told the company would let her know if

something became available. (Id.). As of August 8, Dynamic had not given Cureton any answer or guidance on whether to continue Key's employment. (Doc. 195, p. 66).

Following his August 8 meeting with Key, Cureton emailed her rebuttal to Spires and requested direction on any other steps he should take. (Doc. 195, pp. 65-67; Plaintiff's Trial Exhibit 7). Spires responded on August 9 that she "thought we determined that her hair style was not an issue" and directed him to "keep good notes/documentation in her file because we've probably not heard the end of this." (Id.).

On August 10, Cureton responded to Spires' email by again questioning whether to offer Key another position with Dynamic. (Doc. 195, pp. 68-69; Plaintiff's Trial Exhibit 8). He had not offered Key any positions as of August 10. (Id.). However, in discovery, Dynamic produced documents Cureton completed and signed alleging he offered Key positions on August 1 which she refused. (Doc. 195, pp. 70-73; Plaintiff's Trial Exhibit 15)

On the morning of August 11, 2017, Dynamic learned through an email from the EEOC to Cureton that Key had filed a Charge of Discrimination against Dynamic alleging discrimination based on retaliation, race, and sex. (Doc. 195, pp. 73- 75; Plaintiff's Trial Ex. 9). Cureton forwarded it to Spires. (Id.). He understood Key had made an official complaint of race discrimination. (Id.).

Still not receiving a job assignment, Key went to Dynamic's office on August 11, 2017, asking about available assignments. (Doc. 194, p.78). Dynamic did not offer her any assignments. (Id.).

Later on August 11, Spires emailed Kristal Riddle, Dynamic's Chief Legal Officer, about Key's EEOC Charge, writing she "knew this was coming from day one so I built my file on her which is attached." (Doc. 195, pp. 136 - 140; Plaintiff's Trial Exhibit 10). She then wrote that Cureton would send documentation saying Key had refused job assignments. (Id.). Spires emailed Cureton, an hour and a half after learning of Key's EEOC Charge, stating that Key had sought an employment verification from a government agency, and Spires asked Cureton for a reason for separation. (Doc. 195, pp. 94-96). She wrote:

> What I need from you is:  I need to know reason for her separation. Are you going to use "Voluntarily Quit" or "Job Refusal".

(Id., Plaintiff's Trial Exhibit 11; Doc. 195, p. 141).

The next and last contact Key had from Dynamic was on or around August 22, 2017, when Dynamic sent her a paycheck for $3.25. (Doc. 194, p. 78).

## SUMMARY OF THE ARGUMENT

The District Court considered all relevant evidence and properly denied Dynamic's motion to strike Key's jury demand. The evidence a trial revealed that Key complained of race discrimination after hearing a statement that led her to

believe the applicable grooming policy was not being applied in a race neutral manner. The District Court properly admitted the statement because it was not hearsay and not due to be excluded by the best evidence rule. Key presented evidence to establish that Dynamic failed to reassign her because of her protected activity – evidencing knowledge of the decision maker(s). The District Court's jury instructions properly outlined the law on the elements and causation required in 1981 retaliation claims and nothing about Key's closing argument was improper. Finally, the jury's verdict was substantially supported by the evidence and the District Court properly denied Dynamic's post-trial motions.

## **ARGUMENT**

I.    **The trial court properly denied Dynamic's motion to strike a jury trial.**

After more than three years of litigation, Dynamic filed its motion seeking to strike Key's jury demand. After briefing, the trial court held oral argument on February 21, 2023, in which the court questioned the sufficiency of the jury waiver, asking Dynamic if it had "any evidence showing that Ms. Key signed any document acknowledging that she was waiving her right to a jury[.]" (Appendix 42-1 p52). The court noted the acknowledgement was a separate document that did not contain any reference to a jury waiver, and that Key's testimony did not support a finding that she read and understood the waiver *before* she signed the acknowledgment of receipt of the handbook. The trial court ruled from the bench

that the handbook acknowledgment Key signed did not evidence that Key 'made a knowing waiver of her Seventh Amendment right to a trial by jury. (Appendix 42-1 p 58). The court denied Dynamic's motion. (Doc. 147). Dynamic sought to certify an interlocutory appeal on the issue (Doc. 163), and the trial court denied the motion issuing a written opinion explaining how Dynamic had failed to carry its burden to establish Key waived her right to a jury trial. (Doc. 174).

At trial, Dynamic questioned Key about the purported waiver. The testimony confirmed Key could not state when she read the waiver, or that she knowingly and voluntarily waived her right to a jury trial. Dynamic renewed its motion to strike at the conclusion of Key's case, at the conclusion of Dynamic's case, and in post-trial motions.  At every juncture, the trial court, having considered the evidence in the case, rightfully denied Dynamic's motions finding Dynamic had not carried its burden of proving a knowing and voluntary waiver.

The United States Constitution and federal law secured Key's fundamental right to a jury trial.[4] Courts must analyze jury trial waivers with "the most exacting scrutiny" and" indulge every reasonable presumption *against* waiver." *Burns v. Lawther*, 53 F.3d 1237, 1240 (11th Cir. 1995) (quoting *Aetna Ins. Co., v. Kennedy*,

---

[4] "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . " U.S. Const. amend. VII. The Civil Rights Act of 1991 amended Title VII, in relevant part, by creating a right to trial by jury. *See* 42 U.S.C. §§ 1981a(a)(1) & (c); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17; *Goodgame v. American Cast Iron Pipe Co.,* 75 F.3d 1516, 1518 (11th Cir. 1996).

301 U.S. 389, 393 (1937) (emphasis added). While the decision is in the trial court's discretion, the "court's discretion is very narrowly limited and must, wherever possible, be exercised to preserve jury trial." *Borgh v. Gentry*, 953 F.2d 1309, 1311 (11th Cir. 1992). A waiver may only be enforced where it was made knowingly and voluntarily. *Tracinda Corp. v. DaimlerChrysler AG,* 502 F.3d 212, 222 (3rd Cir. 2007); *Bakrac, Inc. v. Villager Franchise Sys., Inc.*, 164 F. App'x 820, 823 (11th Cir. 2006).

The facts do not support Key executed a knowing and voluntary waiver. She did not execute an employment contract with an express waiver in exchange for consideration. Instead, she executed an acknowledgement that she received the Security Guard Handbook and had some duty in the future to read and understand the policies therein. The waiver was contained at pages 37-39 within the 45+-page pocket manual measuring 4 inches by 5 inches – no larger than a passport book. Dynamic presented no evidence that Key read and understood the waiver contained in the Handbook when she signed the handbook receipt which made no reference to the specific waiver provision, nor did Dynamic present evidence Key read the handbook's waiver provision before performing work for the company. The handbook does not contain a place for an employee to sign acknowledging any of the twenty-five provisions contained therein, and the acknowledgement of receipt

did not reference the waiver. (Ex 1, Dynamic Security Officers Handbook [Doc. 187-8-21 Appendix, 42-15 p82-131]).

While the trial court's analysis did not necessitate considering any ambiguity or inconsistency in the waiver, Dynamic's waiver contains fatal ambiguities preventing any waiver from being knowingly made. The waiver provision in the security officer's handbook states "By waiving the right to a jury trial an employee is not limiting their rights to trial by judge." This sentence, among a section claiming to waive the plaintiff's right to a jury trial represents to the plaintiff that she is *not* limited to a trial by judge only. "[A]mbiguities in contracts are construed against their drafters." *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) (cleaned up). Under this analysis, the ambiguity in whether the waiver does or does not limit the Plaintiff to a judge only trial must be construed against Dynamic. The same results if the sentence was included in error. "[E]rrors in drafting contracts are construed against the drafter." *McGregor v. Board of Commissioners of Palm Beach County*, 956 F.2d 1017, 1022 (11th Cir. 1992). As the drafting party, Dynamic had the opportunity to verify its intention before presenting the handbook to Plaintiff or any other employee. Instead, this provision existed as above for more than 16 years from its creation in 2001 to the date it was given to Plaintiff in 2017. Assuming this sentence was included in error, the error must be construed against Dynamic. Additionally, Dynamic cannot rationally argue the waiver was obvious

- 18 -

when it took Dynamic itself over three years to act on the alleged waiver in this case.

Even if the waiver were not ambiguous and was knowingly and voluntarily made, the trial court can utilize the jury's verdict as advisory without the need to waste future judicial resources. Rule 39(c) of the Federal Rules of Civil Procedure permits a court, on motion or on its own, to try an issue with an advisory jury even where the action may not be triable of right by a jury. Fed. R. Civ. P. 39. A new trial would waste judicial resources and unnecessarily cost all parties unnecessary time and expense. The trial court, having heard all the evidence, can use the jury's verdict to advise a future ruling if this Court sees merit in Dynamic's wavier argument. The Court need not remand the case for bench trial and may allow the trial court to render a verdict using the jury's findings as advisory under Rule 39(c), without re-trying the case.

## II.    Key engaged in protected activity by complaining of race discrimination.

Dynamic argued that Key did not engage in protected activity by maintaining that a complaint about differential treatment because of the natural styling of her hair cannot, as a matter of law, be a complaint protected by § 1981. Dynamic's argument ignores the context of Key's complaints and this Court's well-established precedent. Dynamic's argument appears to require a heightened

standard for retaliation claims by requiring Key to prove that the underlying

conduct which is the subject of the complaint is actually unlawful.

 To engage in protected activity under the applicable retaliation provision,

Key, "[was[ not required to prove that the discriminatory conduct complained of

was actually unlawful." *Alkins v. Sheriff of Gwinnett Cty.*, 2022 U.S. App. LEXIS

23352, at \*5-6, (11th Cir. Aug. 22, 2022)*.* In fact, Key's complaints can be

protected activity even were she reported ""substantively *lawful* conduct . . . 'so

long as [Key] demonstrates a good faith, reasonable belief that the employer was

engaged in unlawful employment practices.'" *Id.* (finding protected activity where

a reasonable person in the plaintiff's shoes could believe that receiving a single,

unwanted, open-mouth kiss, years prior, was sexual harassment.) The conduct

complained of need only "be close enough to support an objectively reasonable

belief that it is." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir.

2016) (citation omitted). Whether the offensive conduct is "close enough" to an

unlawful employment practice is "measured by reference to controlling substantive

law" at that time and requires a fact intensive analysis of the reasonableness of the

plaintiff's belief considering a totality of the circumstances. *See Alkins*, 2022 U.S.

App. LEXIS 23352 at \*6.

 Dynamic claims that because of this Court's precedent in *Equal Emp't*

*Opportunity Comm'n v. Catastrophe Management*, 852 F.3d 1018 (11th Cir.

2016), a complaint referencing dreadlocked hair could never qualify as protected activity and a belief that it could is never reasonable. Dynamic's position ignores the evidence of the context and circumstances surrounding Key's complaint. The facts in this case do not align with the facts in *Catastrophe Mgmt*. "[T]he holdings of a prior decision can reach only as far as the facts and circumstances frame the precise issue presented in that case. *Chavers v. Sec'y, Fla. Dep't of Corr*., 468 F.3d 1273, 1275 (11th Cir. 2006). *Catastrophe Mgmt.* challenged a termination based on no-dreadlocks grooming policy, where the EEOC alleged the employee wore dreadlocks as a choice because the hairstyle as "historically, physiologically, and culturally associated with their race." *Catastrophe Mgmt.,* 852 F.3d at 1030. The question before this Court, however, is not the lawfulness of the policy, but whether the complaint about the policy, considering other circumstances, was protected activity.

The Court's holding in *Catastrophe Mgmt.* revolved around the distinction between immutable and mutable characteristics of race, noted that texture is different from "style," and stated it was "[c]ritical[ ] to the Court's decision that the EEOC did not allege dreadlocks were immutable instead relying on dreadlocks as a choice "historically, physiologically, and culturally associated with their race." *Id* at 1030. Unlike the plaintiff in *Catastrophe Mgmt*., Key specifically testified that her hair was dreadlocked because of its texture and that she would be forced to use

chemical treatments on her hair to prevent the dreadlocks from forming. (Appendix 42-10 p44, p102). Key's case is further distinguishable because Key presented evidence permitting the jury to infer that the policy prohibiting dreadlocks at Hyundai was a proxy for race discrimination, something missing in *Catastrophe Management.* Because she complained of a policy related to the texture of her hair and the grooming policy Key complained of was a proxy for race discrimination, she engaged in protected activity when she complained that she was being treated unfairly because of her hair. Because the facts of this case include testimony about the texture of Key's hair, the facts differ from those in *Catastrophe Mgmt.*, and it's holding is not controlling. Accordingly, the Court correctly denied Dynamic's multiple motions on this argument.

Regardless of the lawfulness of the underlying conduct, when analyzing whether her complaint Key's complaint was reasonable, the trial court did not "view[ ] [the complaint] in isolation," but rather cumulative with other evidence and "in its social context." *Furcron*, 843 F.3d at 1312 (citation omitted). Some of the evidence the trial court heard regarding Key's protected activity includes:

- At trial, the court heard evidence that Key's hair was dreadlocked because of its texture (Doc. 194, pp. 43-44, 101-102),

- On August 1, 2017, Gloria Robinson, a manager for Dynamic, met with Key about Key's request to see applicable grooming standards

- Key's trainer reported Key felt like she was being discriminated against (Doc. 194, pp. 59-63)

- Robinson aggressively confronted her stating "I heard that you feel like you were discriminated against." (Doc. 194, p. 63)

- Robinson told Key she should hot have asked to see the grooming policy because the Koreans were a different breed of animals and that they send little memos and they don't want African Americans . . . wearing their hair in dreadlocks because VIP clientele could see them (Doc. 194, p. 57).

- After that meeting, Key testified she believed that was racist and told Maurice Chambliss, another Dynamic manager, that she wanted to file an "official complaint of discrimination." (Doc. 194, pp. 57, 63-65, 76,116).

- She complained to Cureton at the Dynamic office after he greeted her asking "are you going to sue us."  (Doc. 194, p. 68).

- Key met with Cureton where she testified that she told him everything. In response, he stated he was just a fat old white guy and what did he know about her "feeling discriminated against." (Doc. 194, pp. 68-69).

- Later, on August 11, Dynamic received notice from the EEOC that Key had filed a charge of discrimination alleging race discrimination. (PL Trial Ex 10).

- Dynamic's training on avoiding discrimination explained that "[r]ace discrimination involves treating a person unfavorably because he or she is of a certain race or because of personal characteristics associated with race such as hair texture . . ." (PL Trial Ex 22, Bates No. Dynamic-Key 0000117).

- Cureton testified he received Dynamic's discrimination training for managers contained at PL Trial Ex 22, Bates No. Dynamic-Key 0000117. Sherry Spires, Dynamic's Human Resources Manager in 2017, acknowledged in her trial testimony that discriminating against someone due to his or her hair texture could be unlawful discrimination.

These facts viewed cumulatively and in context, especially in proximity between the complaint and Robinson's alleged statement about Koreans not liking African Americans wearing their hair in dreadlocks, demonstrated that there was a question of fact as to whether Key had both a subjective and objective good faith belief that the way she was being treated was unlawful race discrimination. A reasonable jury could, and did, find that these facts permitted Key to both subjectively and objectively believe that complaining about discrimination due to her dreadlocks was the functional equivalent of complaining about race discrimination. Thus, based on the context Dynamic's training and understanding that discrimination based on hair texture could be race discrimination and

Robinson's alleged statement, Key presented evidence she engaged in statutorily protected activity. *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 n.3 (11th Cir. 2020) ("[Section] 1981 prohibits employers from retaliating against employees for complaining about race discrimination.").

Key's belief is not unreasonably merely because of this Circuit's decision in *Catastrophe Mgmt.* In addition to the case not being binding on the circumstances in the action before this Court, the substantive law on dreadlocks/hair texture/grooming is not necessarily settled. This Court held that plaintiffs who protected a hair length grooming policy had not engaged in protected activity because, among other things, "[e]very circuit to have considered the issue has reached the same conclusion[.]" *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998). Unlike the plaintiffs in *Harper*, nationally, the law is not settled on grooming policies as it relates to hair discrimination. In fact, multiple jurisdictions have enacted or sought to enact the National Crown Act which specifically addresses certain natural, texture related hairstyles associated with race. The mere unsettled nature of this type of discrimination sheds light on the reasonableness of Plaintiff's belief.

A plaintiff can show that she engaged in a statutorily protected activity if her complaint "explicitly or implicitly communicate[s] a *belief* that the practice constitutes unlawful employment discrimination." *Furcron,* 843 F.3d at 1311

(emphasis added). A plaintiff must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Id.* (citing *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). Her burden includes both a subjective and an objective component—"[t]hat is, the plaintiff must not only show that she subjectively (i.e., in good faith) believed the defendant was engaged in unlawful employment practices, but also that her belief was *objectively* reasonable in light of the facts and record present." *Id.* (emphasis in original) (quotations and citation omitted). She only had to prove that the conduct was "close enough to support an objectively reasonable belief" that it was unlawful. *Id.* As argued above, she carried this burden presenting enough evidence for a jury to determine she engaged in protected activity. The trial court correctly denied each of Dynamic's motions on this issue.

## III. The trial court correctly admitted evidence of statements that spoke to the effect on Key.

The trial court did not err by allowing the jury to hear Key's testimony about what Robinson said to her about the grooming policy. Dynamic places great weight on the Best Evidence rule claiming that the statement, which referenced memos, should have been excluded because the memos were the best evidence. While Key would have loved to admit the memo that outlined intentional race discrimination, Dynamic's argument misses the mark. Key did not use Robinson's statement to

establish the truth of the existence of memos, only to show the effect the statement had on Key which directly relates to her good faith belief that her complaint was protected activity

The purpose for which a piece of evidence is admitted governs whether it is hearsay. If an out-of-court statement is offered to prove the truth of the matter asserted, it is hearsay. Fed. R. Evid. 801. The rule ensures reliability of evidence. Accordingly, the best evidence rule tends to go hand-in-hand with the rule against hearsay. "Rule 1002 requires production of an original document only when the proponent of the evidence seeks to prove the content of the writing." *Allstate Ins. Co. v.* Swann, 27 F.3d 1539, 1543 (11th Cir. 1994) (citing *United States v. Howard,* 953 F.2d 610, 612 & n. 1 (11th Cir.1992); *United States v. Tombrello,* 666 F.2d 485, 491 (11th Cir.), *cert. denied,* 456 U.S. 994, 102 S. Ct. 2279, 73 L. Ed. 2d 1291 (1982)). The rule does not require admission of document if the testimony is not offered to prove the contents of the document, but instead, some other fact, like state of mind, understanding, or intent.

The entire evidentiary purpose of the Gloria Robinson statement is related to the effect on Key and her reasonable belief that her complaint was about race. Just as argued above that Key does not have to prove she actually experienced race discrimination to prove she engaged in protected activity, she does not have to prove the actual contents of any purported memos. Rather, she has to present

evidence as to why she felt her complaint was one of race discrimination. She did that by pointing to Robinson's statements and their effect on her. Whether the memo existed, or the actual contents of the memo is irrelevant to Key's claim, the only relevant information is Robinson's statement and the effect on Key.

Further, the best evidence "presupposes the existence at one time" of the original referenced document and is intended to prevent fraud. *See United States v. Howard*, 953 F.2d 610, 613 (11th Cir. 1992). In *Howard,* the Court concluded a monitoring agent could testify to the conversation he overheard even though the recording was only partially decipherable. *Id.* The Court noted that no audible original existed and the agent was subject to vigorous cross examination. *Id*. Not only is the statement offered by Key offered only to show the effect on her, but no original memorandum came to light during discovery and Robinson provided trial testimony wherein Dynamic questioned her about the alleged comments.

Dynamic argued to the jury that Robinson did not make the statement about the Koreans and that no memos existed. Key presented evidence that Robinson made the statement to her and that Robinson's words led Key to believe the grooming policy was directed at black employees. The issues that were to be resolved by the jury were whether Robinson made the statement and what effect the purported statement had on Key. The jury resolved these disputed issues in

favor of Key. The trial court did not err by allowing the testimony and denying Dynamic's best evidence argument.

## IV. Dynamic never reassigned Key because of her protected activity.

In challenging whether Key presented evidence of causation for her retaliation claim, Dynamic argues that there is no evidence "the decision maker" knew she complained of race discrimination.[5] Dynamic's argument is not that Cureton was unaware of Key's complaints, but rather that he did not appreciate they were complaints of race discrimination.  This argument, at is core, is a rephrasing of Dynamic's earlier argument that Key's complaint about hair discrimination was not a complaint of race discrimination. Key adopts and incorporates her arguments by reference.

The jury heard evidence that Cureton received Dynamic's training which included discrimination based on hair texture as an example of race discrimination. Key testified Cureton asked her if she was going to sue them, she told him everything, and that Cureton responded that he was just a fat old white guy and didn't know about discrimination. Cureton referred to Key's complaint as an "official complaint of discrimination" and noted that she planned to sue because of

_____

[5]      It appears Dynamic may be casting Cureton in the role of decision maker since he is referenced in the subsequent lines of argument (Doc. 197, p. 25), but Dynamic does not expressly identify him as the decision maker for not reassigning Key.

it.[6] Cureton received, and forwarded Human Resources and Legal for Dynamic, the notice of Key's Charge of Discrimination, which outlined she had filed a charge for race discrimination.[7] Key argued to a jury these facts evidenced Dynamic knew Key's complaint was a complaint of race discrimination. Dynamic argued to the jury that Cureton did not know this was a complaint of discrimination. The jury resolved this dispute in favor of Key. The trial court did not err in denying Dynamic's motion for judgment as a matter of law because there is evidence from which a jury could, and did, find that Cureton knew Key complained of race discrimination, and as a result, Dynamic did not reassign her to another job.

## V.    The trial court correctly charged the jury on retaliation.

This Court reviews jury instructions *de novo* to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party." *Conroy*

---

[6] In considering an whether an employer has notice of a complaint, the courts have looked to the surrounding circumstances, including the response by the person receiving the complaint. *Olson v. Lowe's Home Ctrs., Inc.*, 130 F. App'x 380, 390-91 (11th Cir. 2005) (finding a question of fact existed as to whether the employee utilized the complaint process where the complaint did not use the terms "sexual harassment" but complained about a specific individual, stated something needed to be done, because he made statements that were "out there", but the employer responded that it could be sexual harassment and she would report it up the chain.)

[7] While Dynamic argues in its motion that "no evidence exists that the Plaintiff made any attempt to be further assigned after the August 11, 2017 notice" so there could not be any retaliation due to the EEOC notice. However, Dynamic's argument ignores the trial testimony that on August 11 after receiving the EEOC Charge, Dynamic considered Key to be a former employee and did not look for any assignments for her. On August 11, after receiving the EEOC Charge, Dynamic questioned how to characterize Key's separation of employment as "voluntary quit" or "job refusal." (PL Trial Ex 11). Key presented evidence at trial that once Dynamic saw Key had made her discrimination complaint "official" by going to the EEOC, it decided she was not longer an employee and did not look for any job assignments for her.

*v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1233 (11th Cir. 2004)

(quotation marks omitted). "If . . . the instructions accurately reflect the law, the

district court has wide discretion as to the instructions' style and wording," and "we

will only reverse if (1) the contents of the requested instruction are not adequately

covered by the jury charge and (2) the requesting party suffers prejudicial

harm." *Id.; Gowski v. Peake*, 682 F.3d 1299, 1310 (11th Cir. 2012) (per curiam)

("We review jury instructions for abuse of discretion and give trial judges wide

discretion as to the style and wording employed." (quotation marks omitted)). A

reviewing court will not reverse a trial court citing erroneous instruction unless the

reviewing court is "left with a substantial and ineradicable doubt as to whether the

jury was properly guided in its deliberations." *United States v. Verbitskaya*, 406

F.3d 1324, 1330-1331 (11th Cir. 2005). The trial court did not err in instructing the

jury on the law.

     The Eleventh Circuit reviews orders denying motions for a new trial based

on erroneous and prejudicial jury instructions for an abuse of discretion. <u>Gowski</u>,

682 F.3d at 1310. The trial court did not abuse its discretion, mislead the jury, or

misstate the law with respect to the jury instructions on the elements of a

retaliation claim, *Catastrophe Management*, or on comments made in closing

argument.

A.     This Court's instructions on retaliation accurately presented the law.

This Court's jury instructions largely resembled the Eleventh Circuit's pattern jury charge for a § 1981 retaliation claim. Dynamic argues these instructions were erroneous because they did not ask the jury to determine if Key engaged in protected activity by complaining about race discrimination. Dynamic's argument is incorrect. The Court instructed the jury that the first element it had to resolve was whether Key engaged in protected activity when she complained to Dynamic. (Doc. 184-6-7). The first question the Court asked the jury to answer on the verdict form was "[t]hat Davita M. Key engaged in protected activity?" (Doc. 185, p. 1).

Dynamic argued this Court should have deviated from the pattern instructions by directing the jury that for Key to have engaged in protected activity, she would need to explicitly or implicitly communicate she was complaining of race discrimination. Dynamic's argument is an appeal for an instruction that a complaint of race discrimination is only protected if it uses the magic words "race discrimination." Dynamic's requested instruction is not an accurate statement of the law; this Court's instruction was.[8]

_____

[8]     To a certain extent, Dynamic's argument for "magic words" in the jury charges is a repackaged version of its argument for judgment as a matter of law that Key's complaint was not protected activity. Key adopts and incorporates her arguments on that point by reference.

For a complaint of discrimination to constitute protected activity, the complaint does not have to specifically use the phrase "race discrimination" or any other magic words, but the facts and circumstances surrounding the complaint should permit the inference that the complaint is about unlawful discrimination. *See Mazloum v. District of Columbia,* 442 F. Supp. 2d 1, 13 (Dist. of Columbia 2006) ("To alert the defendant that he is opposing discrimination, the "[plaintiff] need not . . . employ any `magic words,' such as `discrimination,' for the communication of a complaint of unlawful discrimination . . . may be *inferred* or *implied'* from the surrounding facts;" ) *Okoli v. City Of Baltimore ,* 648 F.3d 216, 224, n.8 (4th Cir. 2011) (sexual harassment case): ("Several sister circuits have noted that sexual harassment complaints need not include 'magic words' such as 'sex' or 'sexual' to be effective. *See, e.g., Broderick v. Donaldson,* 437 F.3d 1226, 1232 (D.C.Cir.2006) ("While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition.")*; Olson v. Lowe's Home Ctrs. Inc.,* 130 Fed.Appx. 380, 391 n. 22 (11th Cir.2005) (unpublished) ('There is no magic word requirement. That is, the employee need not label the events 'sexual harassment' in order to place an employer on notice of the offending behavior')." As argued *supra*, a complaint must be viewed in context of the circumstances of which it was made. From those facts, a jury can determine whether the complaint was about unlawful

discrimination.[9] This Court's instructions were consistent with that legal principle and accurately stated the law.

  B.  The trial court accurately instructed the jury on causation.

  Dynamic argues for a new trial contending the jury should have been instructed that the decision maker(s) for the decision not to reassign Key would have to conclude Key's discrimination complaint was a complaint of unlawful race discrimination for a jury to find that Dynamic did not reassign Key to another job because of her complaints. The trial court did not err in refusing to give a specific knowledge instruction.

---

   [9]  While in the context of gender discrimination under Title VII, the United States Supreme Court in discussing what constitutes a but-for cause recognized how concerns are communicated conversationally without invoking legal language but are still identifiable as unlawful discrimination:

  But this submission rests on a mistaken understanding of what kind of cause the law is looking for in a Title VII case. In conversation, a speaker is likely to focus on what seems most relevant or informative to the listener. So an employee who has just been fired is likely to identify the primary or most direct cause rather than list literally every but-for cause. To do otherwise would be tiring at best. But these conversational conventions do not control Title VII's legal analysis, which asks simply whether sex was a but-for cause. In *Phillips*, for example, a woman who was not hired under the employer's policy might have told her friends that her application was rejected because she was a mother, or because she had young children. Given that many women could be hired under the policy, it's unlikely she would say she was not hired because she was a woman. But the Court did not hesitate to recognize that the employer in *Phillips* discriminated against the plaintiff because of her sex. Sex wasn't the only factor, or maybe even the main factor, but it was one but-for cause—and that was enough. You can call the statute's but-for causation test what you will—expansive, legalistic, the dissents even dismiss it as wooden or literal. But it is the law.

  *Bostock v. Clayton Cty*., 140 S. Ct. 1731, 1745 (2020).

The trial court's given jury instruction e issue of protected activity essentially addresses Dynamic's concern. This Court instructed the jury that for Key's complaint to be protected she would have to have a good faith, reasonable belief she was discriminated against because of race. (Doc. 184, p. 6). The Court then clarified that a belief is "reasonable" if a reasonable person would, under the circumstances, believe that she was discriminated against because of her race. (Doc. 184, p. 6). This instruction permitted the Defendant to argue, which it did, that a reasonable person, or its managers, would not see Key's complaint as protected activity.

Notably, most of the case authority cited by Dynamic about the need to show knowledge on the part of the decision maker of protected activity involved situations where the decision makers denied knowledge of any complaints. Here, there is no dispute that Dynamic Security's decision maker(s) knew Key had made on official complaint of discrimination and filed an EEOC Charge alleging race discrimination. Dynamic's argument, or dispute, is that based on the self-serving testimony of the decision maker(s) denying that it considered her complaint one of race discrimination, it could not be motivated by retaliatory animus. The case law relied on by Dynamic requiring evidence of knowledge does not apply to this situation. Dynamic essentially wanted the trial court to instruct the jury to make a fact finding in its favor. That is not the proper use of jury instructions, and the trial

did not err in refusing to deviate from the pattern instruction and generally established law concerning the elements of retaliation.

Additionally, the instruction given by the trial court covers Dynamic's decisionmaker/knowledge request within the general understanding of causation. The jury instructed provided that the jury must determine whether Dynamic took an adverse action against Key "because of Ms. Key's protected activity" then further explained that an action was because of if Dynamic "would not have taken the action [if] Ms. Key [had] not engaged in the protected activity but everything else had been the same." Doc. 184 p7-8. It is nonsensical to argue that a jury could find the adverse action was "because of" a protected activity but not believe the decision maker had knowledge of the protected activity. The jury charge was clear as provided by the trial court.

Further, the trial court did not err by refusing to instruct the jury on *Catastrophe Mgmt.* as a bright line rule for protected activity. The court's refusal to give a requested charge will not be erroneous if the requested charge misstates the law or does not deal with an issue before the jury. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1287 (11th Cir. 2008). As argued at length above, *Catastrophe Mgmt.* does not stand for the premise that a complaint about hair discrimination based on the texture of dreadlocked hair can never be protected activity. Further, the issue before the jury was not whether the policy was unlawful, but whether

Key's belief that her complaint was protected activity based on race was reasonable. Accordingly, Dynamic's request that the court instruct the jury on *Catastrophe Mgmt.* was both a misstatement of the law and involved an issue not before the jury. Accordingly, the trial court did not err in refusing the instruction.

## VI.    Closing arguments were not improper.

Dynamic argues it is entitled to a new trial due to alleged improper comments made by Plaintiff's counsel in closing argument. A trial court has broad discretion to regulate the scope of closing arguments. *See Danow v. Borack*, 346 F. App'x 409, 410 (11th Cir.2009); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1282 (11th Cir.2008); *Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir.1988). Improper closing arguments rarely warrant new trials; courts should be "reluctant to set aside a jury verdict because of an argument made by counsel during closing arguments." *Vineyard v. County of Murray, Ga.*, 990 F.2d 1207, 1214 (11th Cir.1993); *Peterson v. Willie*, 81 F.3d 1033, 1036 (11th Cir. 1996) ("Statements made in oral arguments must be plainly unwarranted and clearly injurious to constitute reversible error."). "The standard for determining whether a jury verdict should be set aside as a result of misconduct of counsel is whether the conduct was 'such as to impair gravely the calm and dispassionate consideration of the case by the jury.'" *BankAtlantic v. Blythe Eastman Paine Webber, Inc.,* 955 F.2d 1467, 1474 (11th Cir. 1992) (citations omitted). While identifying statements

it believes to be improper, Dynamic makes no effort to show that the statements were of such character to gravely impair the calm and dispassionate consideration of the jury. Thus, Dynamic did not carry its burden in its motion.

Initially, Dynamic argues that Key's counsel made an incorrect factual statement to the jury. Key's counsel denies that conduct, but whether the conduct occurred is immaterial because this Court instructed the jury to consider only the evidence admitted in the case, that the evidence consisted of witness testimony and exhibits admitted, and that "anything the lawyers say is not evidence and isn't binding on you." (Doc. 184, p. 2). Dynamic points to no evidence of facts that suggest the jury disregarded this instruction, disregarded the evidence, and relied on the argument of counsel as opposed to the evidence to reach its conclusion.

Specifically Dynamic takes issue with statements in closing arguments that the reference the belief that hair discrimination can be race discrimination and the grooming policy addressed hairstyles that were typically worn by Black women. The statements referencing that hair discrimination *could* be race discrimination simply outline the facts the jury heard, 1) Key's trainer understood her complaint and reported she felt "discriminated" against and 2) Key believed her complaint to be a complaint of race discrimination.  The statement about the grooming policy addressing styles worn by Black women was 1) not a misstatement, 2) not evidence and 3) directly addressed and rebutted by Dynamic's closing statement

which referenced the statement and instructed the jury to look at the policy which would be in evidence. The trial court heard the closings, considered them in conjunction with its instructions to the jury and, and determined the statements were not improper, prejudicial, or misleading to the jury.

Dynamic takes great issue with Key's closing argument's reference to the "memos," arguing that the grooming policy could be the memos referenced in Robinson's statement to Key. This position, however, takes the statement out of context. What Key's counsel actually stated in closing was to outline the factual testimony given by Dynamics witness, the drafter of the grooming policy. Cassandra Williams testified on cross examination that she worked at the facility for over 19 years and had drafted the grooming policy to ensure a professional appearance of all security staff. She testified she used a previous HMMA policy that prohibited braids and that there was not a writing that prohibited dreadlocks, but it was implied. In closing, Key's counsel noted that any argument by Dynamic questing whether the memos exist was a distraction, that Williams drafted the policy based on something she received from HMMA, and that maybe that could be the memos, but that "[B]ottom line is it doesn't matter" because all Key had to show was that she had a reasonable belief the grooming policy was not being applied neutrally and was engaging in protected activity by raising the complaint.

Again however, the closing statement, even if incorrect, were not improper and did not mislead the jury.

Dynamic offers no evidence or analysis that establishes the jury was misled or misunderstood the issues. There is nothing to suggest the jury did not understand or follow the instruction that what the lawyers say is not evidence or law. Dynamic has not met the very high burden of showing any statements made in Plaintiff's closing argument were of such character to gravely impair the calm and dispassionate consideration of the jury. Thus, Dynamic did not carry its burden in its motion and the court did not err in denying a new trial.

## VII. The trial court did not abuse its discretion by upholding the jury award on punitive and compensatory damages

A.    The jury's award of compensatory damages was supported by the evidence.

In considering a motion for remittitur, the Court must adhere to the principle that a jury verdict should not be disturbed so long as there is competent evidence in the record to support it. *See Deakle v. John E. Graham & Sons*, 756 F.2d 821, 827 (11th Cir. 1985). Remittitur is only appropriate if a jury award "exceeds the amount established by the evidence." *Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1448 (1985), cert. denied, 474 U.S. 1005, 106 S. Ct. 525, 88 L. Ed. 2d 457 (1985).

The standard of review for compensatory damages awards for intangible, emotional harm is "deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999). As a general rule, compensatory damages need not be proven with a high degree of specificity. *See Ferrill*, 168 F.3d at 476. Compensatory damages "may be inferred from the circumstances as well as proved by the testimony." *Id.* (quoting *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977)). A plaintiff may be compensated for intangible, psychological injuries as well as financial, property, or physical harms. *See Marable v. Walker*, 704 F.2d 1219, 1220-21 (11th Cir. 1983) (holding that plaintiff's own testimony that he was embarrassed and humiliated by defendant's conduct was sufficient to support compensatory damages award).

Here, the record establishes that the jury had a reasonable evidentiary basis to award Plaintiff emotional distress damages in the amount of $214,864 for retaliatory discharge.  The jury was instructed on compensatory damages consistent with the Eleventh Circuit pattern instructions. The jury heard the Plaintiff's testimony about her frustration, hurt, and loss of self-esteem that began on August 1, 2017, grew the longer Dynamic went without placing her in another position, and continued through the date of trial. While the conduct may have started with the removal by a different entity, the only issue before the jury was

Dynamic's conduct. The jury also heard testimony about the conduct the Plaintiff suffered, her multiple attempts to reach out to Dynamic, willingness to travel further, and Dynamic's refusal to communicate with her. Dynamic offers no evidence or argument that the jury deviated from the Courts' instructions in reaching its award. Instead, Dynamic argues generally that the award is excessive without providing any basis to so conclude. It offers no evidence of verdicts in comparable cases to serve as a basis for comparison or of how the award was not consistent with the evidence the jury heard.[10]

Dynamic's reliance on *Akouri v. Fla. DOT*, 408 F.3d 1338 (11th Cir. 2005) to justify remittitur is misplaced. In *Akouri*, after the district court set aside a jury award of $552,000 for emotional distress in a failure to promote case, the Plaintiff's main argument on the issue of compensatory damages as that the jury was entitled to infer from his demeanor while testifying at trial that he suffered emotional harm and mental anguish. *Akouri,* 408 F.3d at 1344.  The Eleventh Circuit rejected Akouri's argument finding that inferences were insufficient to support the award. Key presented specific testimony concerning her injuries. While

---

[10]    On December 14, 2022, a jury in the same district awarded $800,000 in emotional distress damages with no award of backpay related to a suspension. *Hall v. Alabama State University*, 2:15-cv-0593-JTA, Doc. 188. On June 2, 2023, a jury in the Northern District of Alabama awarded $600,000 in mental anguish damages collectively across three counts. *McClinton v. Capstone Logistics, LLC*, 2:20-cv-05430-AMM, Doc. 162. Key's jury award of $214,864 is not out of line with other recent jury verdicts.

Dynamic may dispute that testimony or have arguments against it, her testimony and evidence presented was far more substantial than in the *Akouri* case.

There is no merit to Defendants' argument that the award was excessive and should be reduced. There is no basis on which to disturb the jury's verdict with respect to damages awarded to Plaintiff. *See, e.g., Drago v. Jenne*, 453 F.3d 1301, 1305 (11th Cir. 2006).

> B.    The jury heard sufficient evidence to find Dynamic acted with malice or reckless inference to Key's federally protected rights to support a punitive damages award.

The jury, considering the live testimony of the witnesses, was able to consider their training and hierarchy within the company. Cureton testified he took the training that outlined employment discrimination. The jury heard further testimony that showed Dynamic made no effort to ensure its human resources employee, the one responsible for ensuring it followed federal employment laws, actually took any discrimination training. Dynamic witnesses could not testify that the company's anti-discrimination policies were effective and conceded that while its handbook given to Key and others contained various conduct-related policies, the company's multi-page policies relating to discrimination and harassment were only kept in district offices (not where employees performed work) in a notebook. Dynamic even took the position that its human resources manager did not receive its anti-discrimination training. Finally, there was no evidence that in response to

Cureton's multiple email expressions of reservation about reassigning Key due to her complaints, Spires or Riddle admonished him that refusing to reassign her would be unlawful retaliation. The evidence at trial demonstrated Dynamic fell woefully short of making a good faith effort to comply with job discrimination laws. The jury received e-mail evidence outlining Dynamic's understanding that retaliation was illegal and instructing managers to document everything in preparation for future litigation. The jury, presented with the evidence of the case and proper instruction, determined Dynamic acted with malice or reckless inference and performed the its function by awarding Key punitive damages.

 C. The jury's award of punitive damages was not excessive.

 Dynamic argues that the evidence in this case weights against assessing punitive damages because Dynamic's conduct was not reprehensible enough. To support this position, Dynamic alleges Key suffered no physical harm, Key wasn't financially vulnerable, the conduct was not repeated, and there was no malicious intent. For its major support, Dynamic points to its annual training of supervisors and managers. Dynamic ignores the jury's consideration of the testimony that Key suffered emotional distress and applied for multiple jobs while her family depended on her. The jury also heard evidence that the training, was likely ineffective because Cureton did not follow it and it was not even provided to the human resources employee responsible for enforcing anti-discrimination policies.

Federal anti-discrimination laws only work when employees are free to complain about violations without the fear of retribution. *See Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). The anti-retaliation provisions of statutes like § 1981 serves the purpose of protecting individuals from discrimination by "prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Id.*  Key was financially vulnerable, waiting on a job reassignment, when Dynamic decided not to reassign her if she pursued her discrimination complaint. As argued above, Dynamic's actions showed a reckless disregard for her rights and caused her financial and emotional harm. The failure to reassign her was not accidental; it was a deliberate decision conditioned on her pursuit of a discrimination claim. Dynamic's actions were reprehensible.

Dynamic makes no renewed argument concerning the ratio of the punitive award or the Title VII statutory cap and therefore waives these arguments on appeal.

## **<u>CONCLUSION</u>**

The District Court did not err allowing Key's retaliation claim to go to a jury and sufficient evidence supported the Jury's verdict. The District Court's jury instructions, evidentiary rulings, and post-trial rulings were proper. Dynamic has

not met its burden on appeal and the District Court's rulings and jury's verdict should be affirmed.

## <u>CERTIFICATE OF COMPLAINCE</u>

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 10,634 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) as calculated by the word-counting feature in Microsoft Office 365.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point-font, Times New Roman.

Dated: January 27, 2025                     /s/ Leslie A. Palmer
                                                         OF COUNSEL

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2025, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of such filing to the following:

Counsel for Dynamic Security, Inc.
Wesley C. Redmond
Susan W. Bullock
FordHarrison, LLP
wredmond@fordharrison.com
sbullock@fordharrison.com

/s/ Leslie A. Palmer
OF COUNSEL